IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN C. MCCLUSKEY and JOAN        Civil Action No:
MCCLUSKEY, his wife,

    Plaintiffs,

vs.

UNITED STATES OF AMERICA,

    Defendant.

## COMPLAINT

Plaintiffs John C. McCluskey and Joan McCluskey, by and through their attorneys, Peter D. Friday, Esquire and Friday & Cox LLC, complain and allege as follows:

1. John C. McCluskey is an adult individual residing at 323 Ohiopyle Drive, Pittsburgh, Allegheny County, Pennsylvania.

2. Joan McCluskey is an adult individual residing at 323 Ohiopyle Drive, Pittsburgh, Allegheny County, Pennsylvania. At all relevant times, Joan McCluskey is and was plaintiff's wife.

3. Defendant United States of America is the party that owns, operates, maintains, and controls the U.S. Department of Veterans Affairs and its divisions and subdivisions.

4. At all relevant times, husband plaintiff was a patient, visitor, and/or patron of defendant's VA health facilities described herein.

5. The U.S. Department of Veterans Affairs was established by Congress to administer the healthcare system for the Veterans of the United States of America, which includes health administration in the VA Healthcare System.

6. The VA Healthcare System, through its facilities, provides a broad spectrum of medical, surgical, and rehabilitative care for eligible veterans who served in the armed forces of the United States of America.

7. The VA Pittsburgh Healthcare System is a division of the US Department of Veterans Affairs, which provides healthcare to eligible Veterans at its facilities, including the University Drive Campus in Pittsburgh, Pennsylvania and the H.J. Heinz Campus in O'Hara Township, Pennsylvania.

8. The VA University Drive Campus in Pittsburgh, Pennsylvania (hereinafter "VA University Drive") serves as an acute care facility and has 146 operating beds distributed among medicine, surgery, neurology and critical care. In addition, it serves a range of outpatient services and has doctor's offices where Veterans are seen on a daily basis for care for a variety of needs.

**NOTICE**

9. Plaintiffs served the Department of Veterans' Affairs Office of General Counsel with a Standard Form 95 providing notice to the United States Government of these claims.

10. On February 2, 2015, the Office of Regional Counsel of the Department of Veteran's Affairs (Region 4) concluded its investigation and denied the claim.

**JURISDICTION**

11. This action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §2671.

12. Plaintiffs submitted an administrative claim Standard Form 95 to the United States Department of Veterans' Affairs. Receipt of the claims was made. The United States Department of Veterans' Affairs has denied the claims; accordingly, all conditions precedent to the Federal Tort Claims Act have been properly met.

13. Venue is properly within this district under 28 U.S.C. §1402(b) as the acts complained of occurred in the Western District of Pennsylvania.

14. This case is brought against the United States of America pursuant to 28 U.S.C. §2671, *et seq.* (Federal Tort Claims Act) and 28 U.S.C. §1346(b)(1) for money damages as compensation for personal injuries that were caused by the negligent and wrongful acts and omissions of the employees of the United States Government while acting within the scope of their offices and employment, under circumstances where the United States, if a private person, would be liable to the Plaintiffs in accordance with the laws of the state of Pennsylvania.

## BACKGROUND

15. Plaintiff John C. McCluskey, Sergeant First Class, was born in 1928 and grew up in Springdale, Allegheny County, Pennsylvania.

16. Plaintiff John C. McCluskey, comes from a family with a strong sense of patriotism and an inherent desire to serve its country.

17. Husband plaintiff's brother, William McCluskey, served as a pilot in World War II and Colonel in The United States Air Force.

18. Husband plaintiff's brother, Joe McCluskey, served in World War II as a soldier in the United States Army.

19. In 1944, during World War II, plaintiff John C. McCluskey voluntarily enlisted in the United States Army.

20. Husband plaintiff served in the United States Army for 14 years.

21. During this time, husband plaintiff saw combat as a paratrooper with 101st Airborne Division, known as The Screaming Eagles, and trained other soldiers as a Training Officer.

22. Husband plaintiff, participated in Operation Market Garden and in The Battle of the Bulge near Bastogne, Belgium while protecting the United States of America and its Allies. These were key battles that contributed to the Allies' ultimate victory over Axis forces.

23. In 1952, husband plaintiff married his wife of 63 years, Joan, and together they have five children: John Jr., David, Cynthia, Jaquelyn, and Kathleen.

24. After honorable discharge from the Army in 1958, husband plaintiff joined the Teamsters Union and was employed as a truck driver until his retirement.

## FACTS

25. Husband plaintiff was treated at the VA University Drive Hospital for routine eye examinations, glaucoma testing and new eye glasses on or about August 25, 2011, October 6, 2011, November 26, 2012, November 28, 2012, and January 28, 2013.

26. On or about July 15, 2011 and January 27, 2012 plaintiff was treated at the VA University Drive Hospital for a podiatry foot screens for deformed, thick and mycotic nails.

27. On or about August 18, 2011, September 23, 2011, November 2, 2011 and December 5, 2012 plaintiff received audiologic evaluations and hearing aid checks at the VA University Drive Hospital.

28. Husband plaintiff treated at the VA University Drive Hospital and/or Heinz Division on other dates between 2011 and 2013.

29. During the times that husband plaintiff visited the VA Hospitals, he drank from the water fountains and ate in the cafeteria.

30. Plaintiffs noted during one or more visits in approximately 2011 that water fountains at the VA hospital premises were covered and designated not unusable.

31. At some point during the 2011-2013 time frame, husband plaintiff contracted Legionnaire's disease.

32. Husband plaintiff was admitted to UPMC East on February 9, 2013 and complained of fever, body aches, chills, coughing, and blood in the sputum. During his stay, plaintiff was diagnosed with Legionnaires disease.

## LEGIONELLA

33. In 1976, the American Legion was holding its convention in Philadelphia, Pennsylvania when an outbreak of infection caused by bacterial of the genus Legionella was recognized. The outbreak sickened more than 200 people and 34 died.

34. The epidemiological and microbiological investigation led to the isolation of the Legionella bacteria.

35. Legionella is known to be present in a variety of circumstances; however it has a predilection for aquatic environments. Its characteristics allow it to thrive in the lines of water pipes, especially in large buildings, and particularly at temperatures in the range of 35-46° C (95-115° F).

36. In humans, Legionella usually manifests itself as either a fever, or a serious and potentially fatal infection of the lungs, as seen in pneumonia. In most, but not all cases, the Legionella infection, also known as Legionnaires' disease, is a result of a person aspirating or inhaling the infected water containing the Legionella bacteria.

37. Legionnaires' disease is both preventable and treatable.

38. There is no safe level of Legionella bacteria in a water supply.

39. Since the recognition that the Legionella bacteria can flourish in water systems, certain environments have been noted to be particularly susceptible to the growth of Legionella

bacteria, especially hospitals, and as such, healthcare authorities and the Center for Disease Control and Prevention (CDC) monitor and report any known outbreak to contain the spread of any epidemic.

40. It is a known fact that within Pennsylvania, the rates of a Legionella infection are highest in the southwest corner of the state, and are particularly high in and around Allegheny County which includes Pittsburgh, which is also the site of a large Veterans population and the VA University Drive Campus.

41. In 1981, the Pittsburgh VA Healthcare System established a Special Pathogens and Clinical Microbiology Laboratory in Pittsburgh to support the clinical work of the VA in determining the presence of Legionella bacteria in human isolates, from VA patients and from water samples taken from VA facilities.

42. Dr. Victor L. Yu was hired by the VA and was assigned as the Chief of Infectious Disease and the head of the Special Pathogens and Clinical Microbiology Lab. In 1996, he was assigned to head the lab as a Special Clinical Resource in order to expand testing and research of hospitals and public health agencies throughout the county, including non-VA entities, for the purposes of studying Legionella bacteria.

43. Ultimately, the Special Pathogens Lab collected approximately 4,000 isolates which were studied and stored in the lab.

44. Dr. Yu, and his colleague, Dr. Janet E. Stout, studied the Legionella bacteria and published various articles on the use of rapid diagnostic techniques to determine the presence of Legionella in a water system, as well as studied a copper-silver ionization water system to help eradicate Legionella from the water distribution systems in hospitals.

45. In January, 1997, the Allegheny County (Pennsylvania) Health Department, in response to the Legionella outbreaks in Hospital settings and based on the research that was being conducted by the Special Pathogens Lab, published a directive for identifying, treating and controlling Legionella in Allegheny County Health Care Facilities, of which the Pittsburgh VA Hospital was included.

46. The directive established testing guidelines for culture protocol for environmental sampling for the presence of Legionella. Specifically, if the percent of positive cultures was equal to or greater than 30% of the total number sampled, then disinfection of the water distribution system is appropriate.

47. The directive added that the Task Force which studied the issue recognized the arbitrariness of the 30% figure, but noted that even if the percentage of positive cultures was less than 30%, that the definition of the problem be located.

48. The directive also noted that even if less than 30% testing was positive, prospective surveillance must be conducted, and testing for patients with nosocomial pneumonia be tested for Legionella, as well as ensuring that infection control practitioners work with the patient's physician to ensure testing and monitoring continue.

49. Early in the decade of the 2000's, it appeared promising that the copper-silver ionization units would work well to eradicate Legionella, or at least would prohibit the proliferation of Legionella in a water system, if the water system was properly and knowledgably maintained.

50. However, in 2006 the Pittsburgh Veterans Affairs Department decided to close the Special Pathogens and Clinical Microbiology Laboratory, and destroyed many of the Legionella samples that were left in the laboratory after Dr. Yu and Dr. Stout had left.

51. The management at the Pittsburgh Veterans Affairs Department decided that it would rely upon its own maintenance personnel to maintain, test and address the copper-silver ionization and water treatment system at the VA University Drive Campus, as well as control the risk of Legionella disease in the water system.

52. By August 2006, officials at the Pittsburgh VA decided that, while they had advanced the knowledge of Legionella, a change in direction was warranted and that the field of infection control should be more directed to the eradication of MRSA (Methicillin-Resistant Staphylococcus Aureus).

53. Unfortunately, due to the change in focus and the VA Department's lack of understanding of the water systems and the importance of maintaining the same, the copper-silver ion levels in the water treatment system at the VA University Drive Hospital were not properly controlled and were rarely in the effective range to control Legionella. More importantly, the treatment levels were frequently much higher or lower than the effective range, allowing Legionella to grow and fester in the VA University Drive water systems.

## LEGIONELLA AT THE PITTSBRGH VA

54. While understanding that Legionella was still a concern for the hospital, the Pittsburgh VA continued to monitor its systems for Legionella bacteria.

55. On September 21, 2007, the VA Pittsburgh Healthcare System tested samples, and specifically, in the 3A Intensive Care Unit, found that 17 out of 19 samples were positive for Legionella.

56. This finding was followed-up nine months later in June 2008 when 3 positive tests out of 8 samples in the same intensive care unit tested positive for Legionella.

57. In June 30, 2010, 4 out of 9 samples in the 3A Intensive Care Unit tested positive for Legionella.

58. In the following months of July 2010, 6 out of 16 samples tested positive for Legionella.

59. Upon information and belief, on September 8, 2011, plaintiffs aver that 13 out of 22 samples in Unit 6W, 5E, 5W, 4W, 4E and 3A tested positive for Legionella.

60. On October 20, 2011, 1 out of 3 samples from the 8W Unit tested positive.

## VA LEGIONELLA POLICIES

61. In 2008, the Department of Veterans Affairs published a directive establishing guidelines for the evaluation of Legionella risk at the Veterans Hospitals, which was similar to the Allegheny County directive of January 1997.

62. As part of its policy, the Veterans Health Administration Directive noted that Veterans Hospitals were to test water sites at least annually, and that remedial action for Legionella positive environmental samples occurs if "the percentage of positive distal sites is above a 'threshold level' determined by the facility".

63. The Veterans Health Administration then went on to say that it is recommended that a threshold level of positive distal sites be set at 30%.

64. The directive continued on that if there is any association of Legionella bacteria above the threshold that an action plan must be introduced to, among other things, routinely test all patients at the facility with pneumonia for Legionnaire's Disease.

65. Further, the policy noted that if environmental samples are positive for Legionella pneumophila serogroup 1, then all patients at the facility with pneumonia are to be tested by urinary antigen test.

66. Also, the directive noted that any laboratory confirmed positive results for Legionella disease needs to be assessed for epidemiological linkage to the facility.

67. In addition, in 2009 the Department of Veterans Affairs Veterans Health Administration issued a directive on domestic hot water temperature limits for Legionella prevention and scald control. The directive was issued to provide a policy for establishing domestic hot water temperature to prevent Legionnaire's Disease.

68. Although Legionella had been detected in the water supply at the VA University Drive Hospital, directives on using hot water to eradicate Legionella from the water supply at the VA were not properly implemented in that Legionella continued to fester in the water system.

69. In Summer 2011, it became a known fact to officials at the Pittsburgh VA that Legionella was present in the VA University Drive Hospital water system, and several patients began to get sick from the Legionella bacteria.

## WATER SYSTEM MONITORING AT THE VA

70. Rather than reporting the presence of Legionella to the appropriate health officials, officials at the VA Pittsburgh and VA University Drive Hospital attempted to control the outbreak on their own.

71. By December 2011, a company called Liquitech Environmental Systems (hereinafter "Liquitech") paid a courtesy visit to the VA University Drive Hospital to review the water systems and the copper silver ionization systems.

72. Liquitech conducted an examination of the VA University Drive's water supply and found that the water system was not being properly maintained.

73. The employees of Liquitech were told that the maintenance supervisor who was in charge of maintaining the water systems was out on disability leave. Maintenance officials and

employees at the VA University Drive Hospital who were maintaining the water systems did not have the training and experience to handle the complex water treatment systems in place at the VA University Drive Hospital.

74. While Liquitech was making its courtesy visit, although the VA employees knew that there was Legionella in the water system, they did not disclose that to the employees of Liquitech.

75. Further, maintenance workers did not know how to properly eradicate Legionella from the water systems at the VA University Drive Hospital, and altered the test results to make it appear that the conditions were not as bad as they truly were.

### LEGIONELLA OUTBREAK

76. On September 13, 2011, the Chief of Staff of the VA University Drive Hospital, Ali F. Sonel, M.D., sent a memorandum to the medical staff notifying them that copper silver ionization units in use at the VA University Drive hot water supply were insufficient to prohibit growth of the Legionella pneumophila bacteria.

77. As a precautionary measure, Dr. Sonel recommended use of bottled water in areas where patients would be at a high risk of infection.

78. Because remediation procedures were going to be implemented, Dr. Sonel asked that a Legionella urinary antigen for all patients with hospital-acquired pneumonia and a Legionella culture for those that were producing sputum be obtained.

79. In spite of Dr. Sonel's memo, in the three (3) months following the memo, only seven (7) of seventeen (17) patients in the hospital with suspected hospital-acquired pneumonia were tested for Legionnaire's Disease, allowing ten (10) cases to be underreported.

## COUNT I
### John C. McCluskey vs. The United States of America
### NEGLIGENCE

80. All preceding paragraphs are incorporated herein by reference.

81. Defendant United States of America was negligent in the following particulars:

   a. In failing to maintain its water system at the VA University Drive Hospital to allow the Legionella bacteria to grow to epidemic proportions;

   b. In failing to properly teach, instruct and monitor the employees of the VA University Drive Hospital in how to maintain the water system;

   c. In failing to have adequate management of the special water treatment system intended to keep the deadly Legionella bacteria from thriving;

   d. In failing to correct the problems and to understand the phrase "heat and flush" to eradicate the Legionella bacteria from the water system at the VA University Drive Hospital;

   e. In failing to hyper-chlorinate the water system during potential eradication of the Legionella bacteria from the water system at the VA University Drive Hospital;

   f. In failing to hire the appropriate facilities manager with the proper education and understanding of water facilities and water treatment system wherein the Legionella bacteria can thrive;

   g. In failing to test for Legionnaire's Disease in all patients believed to have contracted pneumonia while hospitalized as required by the 2008 guidelines issued by the Veterans Health Administration;

   h. In failing to communicate between facilities management and infection control to understand the Legionella outbreak and eradication efforts;

   i. In failing to protect the patients in the VA Hospital when they were aware that Legionella was present in the water system;

   j. In reporting inaccurate ionized levels for Legionella control to persist, allowing Legionella to flourish in the water system;

   k. In failing to maintain the copper-silver ionization at the VA;

l.  In altering the test results from the monitoring of the copper-silver ionization system;

m.  In failing to have anyone from the facilities management team actively aware or belonging to the infection control team;

n.  In failing to test all outlets, and only selecting and testing certain outlets, to determine whether or not Legionella was present in the hospital;

o.  In failing to control the ion levels in the copper-silver ionization system which allowed Legionella to persist in the water system;

p.  In failing to bring in outside consultants and experts who had knowledge of Legionnaire's Disease;

q.  In failing to properly communicate within the hospital concerning the Legionnaire's outbreak so that prophylactic testing and treatment could be performed on patients;

r.  In allowing John McCluskey to be exposed to Legionnaire's Disease in the VA Hospital;

s.  In allowing John McCluskey to be exposed to Legionnaire's Disease in the VA Hospital when it was known that there was Legionnaires in the VA hospital;

t.  In failing to timely diagnose John McCluskey with the Legionella bacteria;

u.  In failing to timely order and administer intravenous Levaquin to treat John McCluskey's Legionella infection;

v.  In failing to timely administer intravenous Levaquin prophylactically before definitive Legionella test results were available;

w.  In failing to inform John McCluskey that Legionella bacteria had been discovered in the water purification system at the facility;

x.  In failing to protect John McCluskey from Legionella bacteria exposure;

y.  In violating the standard(s) of care required by a veteran's hospital to diligently and appropriately asses, reassess, inspect, and sanitize its water systems to prevent the spread of Legionnaire's disease.

82. Defendant's negligence was the legal cause of plaintiffs' injuries and damages described herein.

83. Defendant's negligence increased the risk that plaintiffs would suffer the injuries and damages described herein.

84. As a direct and proximate result of defendant's negligence plaintiffs suffered and the defendant is liable to plaintiffs for their injuries and damages described herein.

85. As a direct and proximate result of the negligence and/or carelessness of defendant, plaintiff John C. McCluskey suffered the following injuries and damages:

   a. Legionnaire's Disease;

   b. Need for extensive testing and medical procedures;

   c. Need for hospitalizations;

   d. Complications, infections, trauma;

   e. Physical pain and suffering;

   f. Loss of enjoyment of life's pleasures;

   g. Decreased life expectancy;

   h. Mental anguish and emotional distress; and

   i. Embarrassment and humiliation.

WHEREFORE, plaintiff John McCluskey respectfully requests this Honorable Court enter judgment in his favor and against defendant in an appropriate amount and that plaintiff be awarded damages, fees, costs and all other relief as permitted by the Court.

## COUNT II
### *John C. McCluskey vs. The United States of America*
### PROFESSIONAL NEGLIGENCE

86. All preceding paragraphs of this complaint are incorporated herein by reference.

87. At all relevant times, defendant was a healthcare provider as defined by the law, rules and regulations of the United States.

88. Defendant had a duty as a health care provider to properly and adequately observe, diagnose, assess, treat and prevent harm to husband plaintiff.

89. At all relevant times, defendant held itself out to be a skilled medical care facility which possessed the knowledge, skill, training, experience and certification to own, operate, lease, maintain, control and administer a hospital for patients such as husband plaintiff, and claimed itself to be so qualified.

90. At all relevant times, defendant owned, operated, controlled, possessed, administered and maintained a hospital governed by Pennsylvania, Federal and local laws, rules, regulations, codes and statutes.

91. At all relevant times, defendant owed a duty of care to properly and adequately care for, supervise, treat and prevent injury to husband plaintiff.

92. Husband plaintiff's injuries and damages were a direct and proximate result of defendant's professional negligence, including breaches of the standard of care for health care providers in the following particulars:

    a. In failing to provide reasonable, necessary and appropriate care to plaintiff so as to protect her from Legionnaire's disease;

    b. In failing to properly or adequately identify, qualify and quantify husband plaintiff's risk of being exposed to Legionella bacteria;

c. In failing to have an adequate care plan in place to prevent husband plaintiff's exposure to Legionella bacteria;

d. In failing to exercise the appropriate level of supervision and/or staffing personnel to adequately provide the appropriate care of patients to ensure that they would not be exposed to Legionella bacteria;

e. In failing to properly or adequately hire, train, educate, and supervise staff and personnel to prevent, control and otherwise avoid risk(s) of legionella bacteria to patients and visitors alike;

f. In failing to provide reasonable care to prevent injury in accordance with the standard of care for healthcare facilities treating patients, such as husband plaintiff;

g. In failing to exercise the care, skills, training, knowledge, and judgment of members of the medical community;

h. In failing to provide competent nursing staff to fulfill assigned responsibilities;

i. In failing to hire a sufficient number of employees to care for patients;

j. In supervisors failing to provide proper supervision to the employees responsible for ensuring Legionella bacteria does not reach unsafe levels in the water system.

k. In failing to have in place policies to assign staff members to meet patient care needs or failing to enforce those policies if they were in place;

l. In failing to educate plaintiffs on the dangers of Legionella bacteria;

m. In failing to closely monitor and protect husband plaintiff from exposure to Legionella bacteria;

n. In allowing the hospital to remain open when defendant knew or reasonably should have known of the presence of Legionella bacteria in the water system and of the harm that could and did result to patients such as plaintiff;

o. In failing to read, follow and review its own Legionella control policies and procedures;

    p.    In failing to exercise the appropriate duty of care to protect veterans like husband plaintiff from Legionella; and

    q.    In failing to observe and follow Veteran's administration mandates to protect patients from harm, including Legionnaire's disease.

WHEREFORE, plaintiff demands judgment against defendant, together with fees, court costs, interest and all other relief permitted by the Court.

## COUNT III
### *Joan McCluskey vs. The United States of America*
### LOSS OF CONSORTIUM

93.    All preceding paragraphs are incorporated herein by reference.

94.    As a direct and proximate result of defendant's negligence, professional negligence and breaches of the standard(s) of care, wife plaintiff, Joan McCluskey, has suffered the reduction and loss of companionship, services and consortium of her husband, John McCluskey.

WHEREFORE, plaintiff respectfully requests judgment in her favor and against defendant in an appropriate amount and that plaintiff be awarded damages, fees, costs and all other relief as permitted by the Court.

Respectfully submitted,

Friday & Cox LLC

A JURY TRIAL IS DEMANDED

By: _____ for
Peter D. Friday, Esquire
PA ID#48746

1405 McFarland Road
Pittsburgh, PA 15216
(412) 561-4290